IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


JOANNE C.,[1]                                        Case No. 6:17-cv-01762-SB

      Plaintiff,                               **OPINION AND ORDER**

      v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

      Defendant.

_____

**BECKERMAN, U.S. Magistrate Judge.**

      Joanne C. ("Plaintiff") brings this appeal challenging the Commissioner of Social

Security's ("Commissioner") denial of her application for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act, 42 U.S.C. §§ 401-34. The Court has jurisdiction to hear

this appeal pursuant to 42 U.S.C. § 405(g). For the reasons that follow, the Court affirms the

Commissioner's decision because it is free of harmful legal error and supported by substantial

evidence.

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case. Where applicable, this opinion uses the same designation for a non-governmental party's immediate family member.

# BACKGROUND

Plaintiff was born in July 1956, making her fifty-four years old on December 31, 2010, the alleged disability onset date. (Tr. 54, 63.) Plaintiff has a General Equivalency Diploma and past relevant work as a claims clerk and customer complaint clerk. (Tr. 22, 31, 37, 46-47.) Plaintiff alleges disability due primarily to arthritis, cervical spine and neck issues, diabetic neuropathy, bouts of depression, occasional migraines, knee pain, and worsening fatigue. (*See* Tr. 39-46, 54.)

On February 16, 2011, approximately a month and a half after the alleged onset date, Plaintiff established care with Caralynn Moore ("Moore"), a nurse practitioner. (Tr. 177.) Moore noted, among other things, that Plaintiff complained of pain in her neck, lower back, and knees. (Tr. 177.)

On October 30, 2013, an x-ray of Plaintiff's cervical spine revealed "[d]egenerative disc disease and cervical spondylosis." (Tr. 179.)

On November 26, 2013, Moore completed a medical source statement. (Tr. 180-82.) In her medical source statement, Moore stated that she has treated Plaintiff for six months; Plaintiff has been diagnosed with, *inter alia*, diabetes, depression, and chronic neck and back pain; Plaintiff suffers from headaches, fatigue, and pain in her knees, neck, shoulders, arm, and lower back; Plaintiff's diabetes is "uncontrolled" and activity increases her pain; and on physical examination, Plaintiff reported musculoskeletal pain and exhibited palpable tenderness in the neck and upper back. (Tr. 180.) Moore also stated that Plaintiff must use a cane when walking, and that Plaintiff is not a malingerer. (Tr. 180.) In addition, Moore opined that: (1) Plaintiff can "[s]tand/walk" or sit for two hours or less during an eight-hour workday; (2) Plaintiff needs "a job that permits shifting positions *at will* from sitting, standing, or walking"; (3) Plaintiff can rarely lift and carry less than ten pounds and never lift and carry ten pounds or more; (4) Plaintiff

can occasionally twist and climb stairs, rarely stoop or crouch, and never climb ladders; (5) Plaintiff suffers from "significant limitations with reaching, handling, or fingering"; and (6) Plaintiff would miss more than four days of work per month due to her impairments or treatment. (Tr. 181-82.)

Plaintiff visited Dr. Paul Donaldson ("Dr. Donaldson") for a consultative examination on or about January 6, 2014. (Tr. 184-90.) Based on a clinical interview, review of Plaintiff's medical records, and an examination, Dr. Donaldson's diagnoses were: (1) degenerative joint disease, which relates to Plaintiff's chronic lower back pain, cervical spondylosis with chronic cervical pain and slight decrease in range of motion, and "[b]ilateral knee pain with bilateral patellofemoral syndrome" that is worse on the right side; (2) diabetes that is "controlled with oral medications," but does result in peripheral neuropathy in the "bilateral lower extremities and to a lesser degree intermittent bilateral upper extremities"; (3) migraines "[t]hree to four times a year"; (4) hypertension; (5) hyperlipidemia; (6) chronic depression that is "[c]ontrolled on oral medication"; and (7) "[m]edically significant obesity." (Tr. 189.) Dr. Donaldson also noted that Plaintiff is a "[c]igarette smoker." (Tr. 189.)

On September 25, 2015, a computed tomography ("CT") scan of Plaintiff's abdomen revealed, among other things: (1) "[d]egenerative changes of the spine with disc space narrowing most prominent at L5-S1"; (2) "[e]vidence of bilateral L5 par defects [i.e., spondylosis] and [a] grade 1 anterolisthesis of L5 on S1"; and (3) no signs of any "destructive bony lesions." (Tr. 223-24.)

On January 23, 2014, Dr. William Fernandez ("Dr. Fernandez"), a non-examining state agency physician, completed a physical residual functional capacity assessment. (Tr. 58-60.) Based on his review of the record, Dr. Fernandez concluded that Plaintiff can lift and carry

twenty pounds occasionally and ten pounds frequently; sit, stand, and walk about six hours in an eight-hour workday; push and pull in accordance with her lifting and carrying restrictions; frequently balance and climb ramps and stairs; and occasionally stoop, kneel, crouch, crawl, and climb ladders, ropes, or scaffolds. Dr. Fernandez also concluded that Plaintiff does not suffer from any manipulative, visual, or communicative limitations, but she does need to avoid concentrated exposure to extreme cold, vibration, and workplace hazards (environmental limitations).

On July 31, 2014, Dr. Howard Horsley ("Dr. Horsley"), a non-examining state agency physician, completed a physical residual functional capacity assessment. (Tr. 69-70.) Dr. Horsley agreed with Dr. Fernandez's functional assessment in all respects, with the exception of the following: (1) Dr. Horsley concluded that Plaintiff could only stand or walk for four hours during an eight-hour workday; and (2) Dr. Horsley concluded that Plaintiff can frequently stoop. (Tr. 69-70.)

On February 8, 2016, an x-ray of Plaintiff's cervical spine revealed "[n]o acute osseous abnormality" and "[m]ultilevel spondylolisthesis," which was "likely degenerative related." (Tr. 222.)

On April 2, 2016, a magnetic resonance imaging ("MRI") of Plaintiff's cervical spine revealed: (1) "[m]ultilevel degenerative disc disease, spondylosis and facet arthropathy"; (2) "[a]t C3-4, mild central canal stenosis and moderate left neural foraminal stenosis which could affect the exiting left C4 nerve root"; (3) "[a]t C4-5, moderate central canal stenosis with cord flattening, and moderate bilateral neural foraminal stenosis"; (4) "[a]t C5-6, mild right neural foraminal stenosis"; (5) at C7-T1, "[n]o significant central canal or neural foraminal stenosis," and "[m]ild posterior central disc protrusion"; (6) "moderate disc height loss throughout the

cervical spine"; and (7) "[n]o central canal or neural foraminal stenosis" at the C2-3 level. (Tr. 226.)

On June 30, 2016, Plaintiff appeared and testified at a hearing before an Administrative Law Judge ("ALJ"). (Tr. 29-52.) Plaintiff testified that she last worked on December 31, 2009, that she was fired from her last job based on a dispute with her supervisor, and that she suffers from diabetes and cervical spine and neck-related issues, which results in, *inter alia*, numbness in her hands, and impacts her ability to open jars and use a keyboard and computer mouse. (Tr. 37-40.) Plaintiff also testified that she has a hard time holding her head up, stress causes her neck to tighten up, and her diabetes has "come more under control" within the last year, but she still suffers from neuropathy that impacts her ability to walk more than a block and a half without resting. (Tr. 40-43.) In addition, Plaintiff testified that knee pain impacts her ability to maintain her balance, stand, and walk; that she experiences "a lot of fatigue" due to kidney disease; that she has a hard time sleeping due to pain; that she needs to "rest a lot" when doing household chores; and that she suffers from occasional migraines and monthly bouts of depression. (Tr. 44-46.)

The ALJ posed a series of hypothetical questions to a Vocational Expert ("VE") who testified at Plaintiff's hearing. First, the ALJ asked the VE to assume that a hypothetical worker of Plaintiff's age, education, and work experience could perform work that involves lifting twenty pounds occasionally and ten pounds frequently; standing and/or walking four hours in an eight-hour workday; sitting for six hours in an eight-hour workday; no more than occasional climbing of ramps or stairs; never climbing ladders, ropes, or scaffolds; no more than occasional balancing, stooping, kneeling, crouching, and crawling; and avoiding concentrated exposure to extreme cold, excessive vibration, and workplace hazards, such as hazardous machinery and

unprotected heights. (*See* Tr. 47.) The VE testified that the hypothetical worker could not perform Plaintiff's past work as a bartender, but the hypothetical worker could perform Plaintiff's past relevant work as a claims clerk and customer complaint clerk. (*See* Tr. 46-47.)

Second, the ALJ asked the VE to assume that the hypothetical worker described above was also limited to occasional bilateral overhead reaching, and frequent bilateral handling and fingering. (Tr. 47.) The VE testified that the hypothetical worker could still perform the jobs of claims clerk and customer complaint clerk, because the Dictionary of Occupational Titles "does not distinguish between overhead reaching and other types of reaching," and because, in the VE's opinion, "[t]here would be no more than occasional overhead reaching in either of these jobs." (Tr. 48.)

Responding to the ALJ's follow-up questions, the VE confirmed that the hypothetical worker could not perform the jobs of claims clerk or customer complaint clerk if she was limited to occasional bilateral handling and fingering; testified that the hypothetical worker could not perform other jobs if she was limited to occasional handling and fingering, and to standing and walking four hours "without a sit/stand" option; and stated that the hypothetical worker could not sustain gainful employment if she missed work twice a month on a consistent basis. (Tr. 48-49.) Responding to a question from Plaintiff's attorney, the VE testified that the hypothetical worker could not sustain gainful employment if she was off task more than five percent of the workday. (Tr. 50.)

In a written decision issued on August 9, 2016, the ALJ applied the five-step evaluation process set forth in 20 C.F.R. § 404.1520(a)(4), and found that Plaintiff was not disabled. *See infra.* The Social Security Administration Appeals Council denied Plaintiff's petition for review,

making the ALJ's decision the Commissioner's final decision. Plaintiff timely appealed to federal district court.

## THE FIVE-STEP DISABILITY ANALYSIS

### I.    LEGAL STANDARD

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are: (1) whether the claimant is presently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant is capable of performing other work that exists in significant numbers in the national economy. *Id.* at 724-25. The claimant bears the burden of proof for the first four steps. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of those steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## II.  THE ALJ'S DECISION

The ALJ applied the five-step sequential process to determine if Plaintiff is disabled. (Tr. 13-23.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity during the period between her alleged onset date (December 31, 2010) and date last insured (December 31, 2014).[2] (Tr. 15). At step two, the ALJ determined that Plaintiff had the following severe impairments: "[D]egenerative disc disease of the cervical spine; and spondylosis and facet arthropathy." (Tr. 15.) At step three, the ALJ concluded that Plaintiff did not have an impairment that meets or equals a listed impairment. (Tr. 19.) The ALJ then concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work that involves: (1) lifting and carrying twenty pounds frequently and ten pounds occasionally; (2) standing and walking up to four hours during an eight-hour workday; (3) sitting for up to six hours during an eight-hour workday "with normal breaks"; (4) no more than occasional bilateral overhead reaching; (5) no more than frequent bilateral handling and fingering; (6) no more than occasional climbing of ramps and stairs; (7) never climbing ladders, ropes, or scaffolds; (8) no more than occasional balancing, stooping, kneeling, crouching, and crawling; and (9) avoiding concentrated exposure to extreme cold, excessive vibration, and workplace hazards. (Tr. 18.) At step four, the ALJ determined that Plaintiff could perform her past relevant work as a claims clerk and customer complaint clerk. (Tr. 22.) Accordingly, the ALJ determined that Plaintiff

---

[2] To be eligible for DIB under Title II, "a worker must have earned a sufficient number of [quarters of coverage] within a rolling forty quarter period." *Herbert v. Astrue*, No. 07–01016, 2008 WL 4490024, at *4 n.3 (E.D. Cal. Sept. 30, 2008). Quarters of coverage are accumulated based upon a worker's earnings. *Id.* Typically, "the claimant must have a minimum of twenty quarters of coverage [during the rolling forty quarter period to maintain insured status]. . . . The termination of a claimant's insured status is frequently referred to as the 'date last insured' or 'DLI.'" *Id.* (citations omitted). Thus, Plaintiff's date last insured of December 31, 2014, reflects the date on which her insured status terminated based on the prior accumulation of quarters of coverage.

"was not under a disability, as defined in the Social Security Act, at any time from December 31, 2010, the alleged [disability] onset date, though December 31, 2014, the date last insured." (Tr. 23.)

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## DISCUSSION

In this appeal, Plaintiff argues that the ALJ erred by: (1) failing to provide clear and convincing reasons for discounting Plaintiff's symptom testimony; and (2) failing to provide germane reasons for discounting the opinion of Plaintiff's treating nurse practitioner, Moore. As explained below, the Court concludes that the Commissioner's decision is free of harmful legal

error and supported by substantial evidence. Accordingly, the Court affirms the Commissioner's decision.

## I.    PLAINTIFF'S SYMPTOM TESTIMONY

### A.    Applicable Law

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited[.]" *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives specific, clear and convincing reasons for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation and quotation marks omitted).

Under Ninth Circuit case law, clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012) (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008), *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007), and *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).

///

### B.    Application of Law to Fact

Here, there is no evidence of malingering and the ALJ determined that Plaintiff has provided objective medical evidence of an underlying impairment which might reasonably produce the pain or symptoms alleged. (*See* Tr. 21, "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]"). Accordingly, the ALJ was required to provide clear and convincing reasons for discounting Plaintiff's symptom testimony. (*See* Def.'s Br. at 2, stating that under the circumstances presented here, the Court must review the ALJ's findings "for clear and convincing reasons"). The ALJ satisfied the clear and convincing reasons standard.

### 1.    Conservative Treatment

The ALJ discounted Plaintiff's testimony on the ground that "her complaints have been managed conservatively." (Tr. 20.) In support of this finding, the ALJ noted that Plaintiff treated her conditions with "conservative treatment of pain medication" and reported some relief, and that Plaintiff "has not received any physical therapy or injections, she does not wear a brace of any kind, and no surgery or indication for surgery is noted" in Plaintiff's medical records. (Tr. 20.)

It is well settled that an ALJ may discount a claimant's testimony based on evidence of conservative treatment. *See Parra v. Astrue*, 481 F.3d 742, 750–51 (9th Cir. 2007) (stating that "evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment"). In *Tommasetti v. Astrue*, for example, the claimant "responded favorably to conservative treatment including physical therapy and the use of anti-inflammatory medication, a transcutaneous electrical nerve stimulation unit, and a lumbosacral corset." 533 F.3d at 1040. The Ninth Circuit affirmed the ALJ's decision and concluded "[s]uch a response to

conservative treatment undermine[d] [the claimant's] reports regarding the disabling nature of his pain." *Id*.

Plaintiff argues that her case is distinguishable from the "extremely conservative" course of treatment undertaken by the claimant in *Tommasetti*, because Plaintiff "managed her impairment with medications, heat, and ice," and because Moore prescribed Plaintiff hydrocodone-acetaminophen. (Pl.'s Br. at 12, citing Tr. 178, listing hydrocodone "10/325" on the medication log after Plaintiff's initial visit). However, courts have upheld conservative treatment findings under similar circumstances. *See Braunstein v. Berryhill*, No. 16-1026, 2017 WL 923901, at *10 (C.D. Cal. Mar. 8, 2017) ("Courts have found that treatment consisting of *only* pain medication and infrequent steroid injections may be considered routine and conservative."); *Garza v. Colvin*, No. 15-02425, 2016 WL 7391507, at *12 (C.D. Cal. Dec. 21, 2016) (collecting cases in which treatment consisting of pain medication and cortisone injections, physical therapy and cortisone injections, Vicodin and Tylenol, and Vicodin, physical therapy, and a single injection, constituted conservative treatment); *Medel v. Colvin*, No. 13-2052, 2014 WL 6065898, at *8 (C.D. Cal. Nov. 13, 2014) (affirming the ALJ's conservative treatment findings where the claimant was prescribed pain medications comprised of hydrocodone and acetaminophen). Accordingly, the ALJ did not err in discounting Plaintiff's testimony based on her conservative treatment history.

## 2.     Conflicting Medical Evidence

The ALJ also rejected Plaintiff's allegations of disabling physical impairments based on inconsistency with the objective medical evidence showing largely unremarkable physical examinations. (*See* Tr. 19, stating that "the objective findings of this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations," and describing unremarkable examination results; Tr. 20, stating that Plaintiff "has shown little physical

limitation upon medical examination," and citing Plaintiff's "generally negative physical exams" as support for an RFC limiting Plaintiff to "light work with limitations on her postural and manipulative activities"; Tr. 21, stating that Plaintiff's testimony is "not entirely consistent with the medical evidence"). It is well settled that an ALJ may discount a claimant's testimony based on conflicting objective medical evidence. *See, e.g.*, *Centanni v. Berryhill*, 729 F. App'x 560, 562 (9th Cir. 2018) (holding that the ALJ satisfied the clear and convincing reasons standard, and noting that the "ALJ properly rejected" the claimant's testimony "based on inconsistency with the objective medical evidence showing largely unremarkable physical examinations").

### a.      Plaintiff's Treatment Records

Before addressing Plaintiff's argument that the ALJ erred in discounting her symptom testimony based on conflicting objective medical evidence, the Court notes that the record does not include many treatment records, and includes few treatment records that predate Plaintiff's date last insured of December 31, 2014.[3] Plaintiff's treatment records reveal the following:

- On February 16, 2011, a month and a half after the alleged onset of disability and over a year after Plaintiff stopped working, Plaintiff established care with Moore. Moore noted that Plaintiff's musculoskeletal examination was abnormal, and Moore's findings included reports of pain in Plaintiff's neck, back, and knees. (Tr. 177.)

- On November 23, 2011, Plaintiff returned to Moore's office. Although portions of this copied record are unreadable, it appears to show that Plaintiff complained primarily about an ingrown toenail and was advised to soak her toe. The treatment

---

[3] Plaintiff's insured status expired on December 31, 2014, and therefore she was required to establish that she was disabled on or before this date. *See Tidwell v. Astrue*, 161 F.3d 599, 601 (9th Cir. 1998) ("Appellant's insured status expired on September 30, 1992. To be entitled to disability [insurance] benefits, Appellant must establish that her disability existed on or before this date.") (citation omitted).

record, however, does make clear that Moore did not check any of the boxes necessary to indicate that Plaintiff's physical examination was abnormal. (Tr. 176.)

- On October 25, 2013, one day after Plaintiff completed her function report, nearly two years after Plaintiff last visited Moore, and nearly three years after the alleged onset date, Plaintiff returned to Moore's office, complaining of chronic pain in her neck and back. Moore noted that the musculoskeletal examination was abnormal, she planned to order cervical spine images, and her findings included neck and back pain. (Tr. 174.)

- On October 30, 2013, Moore referred Plaintiff to Central Montana Imaging, Inc., based on Plaintiff's "[c]hronic neck pain with limited range of motion." (Tr. 179.) X-rays were taken of Plaintiff's cervical spine in the anteroposterior, oblique, and lateral views. The radiologist, Dr. George Ro ("Dr. Ro"), noted that the lateral view was "blurred," but the x-rays nevertheless revealed degenerative disc disease, spondylosis, facet osteoarthropathy, and mild disc space narrowing at C4-5 and C6-7. (Tr. 179.)

- On November 26, 2013, Plaintiff visited Moore and complained of chronic pain. Moore noted that Plaintiff's musculoskeletal examination was abnormal. Moore's findings included pain in Plaintiff's neck, back, and knees, and an inability "to do physical activities." (Tr. 175.)

- Also on November 26, 2013, Moore completed a medical source statement, wherein she essentially opined that Plaintiff's physical impairments would prevent her from sustaining gainful employment. (*See* Tr. 180-82, opining that Plaintiff's impairments or treatment would cause her to be absent from work more than four days per month; *cf.* Tr. 49, indicating that the VE testified that a hypothetical worker could not sustain

gainful employment if she missed work more than one day per month on a consistent basis).

- Plaintiff visited Dr. Donaldson for a consultative examination on or about January 6, 2014. Dr. Donaldson noted that Plaintiff "shakes with a strong right-hand dominant walker," he did not ask Plaintiff "to squat and recover because of [reported] knee issues," Plaintiff's head range of motion was restricted with "tilting and extension especially caus[ing] pain at the base of [the] neck," and he detected crepitus in Plaintiff's knees "with flexion to endpoint of normal range of motion." (Tr. 188.) Dr. Donaldson, however, also noted that Plaintiff's gait and station were normal with a "little bit of wide based stance"; Plaintiff could tandem, heel, and toe walk; Plaintiff exhibited "4+/5 and symmetrical" strength "in all four extremities," and normal range of motion in her "shoulders, elbows, hands, wrists, T-spine, LS spine, hips, knees, ankles, and feet"; straight leg tests were negative; Plaintiff's hip exam was normal; and Plaintiff's grip strength was measured to be "65 pounds right and 45 pounds left." (Tr. 188.)

- On September 22, 2015, Plaintiff visited Mary Ruth ("Ruth") at an Oregon-based medical clinic.[4] Plaintiff complained about "pain to [the] right lower lateral ribs for [a] few days." (Tr. 219.) Ruth noted that Plaintiff's physical examination revealed "slight tenderness to [the] right lower ribs," and tenderness in the chest wall with no "mass present." (Tr. 220.) Plaintiff was given a prescription for a muscle relaxant. (Tr. 221.)

---

[4] The record does not indicate that Ruth is a medical doctor.

- On September 24, 2015, Plaintiff visited Ruth and complained about continued pain "over [the] lower back and right upper right quadrant of [her] abdominal wall" and "just below [her] lower right ribs." (Tr. 215.) Ruth diagnosed Plaintiff with "[a]bdominal or pelvic swelling, mass, or lump, unspecified site," and she prescribed Plaintiff 120 tablets of acetaminophen and hydrocodone with no refills. (Tr. 217.)

- On September 25, 2015, a CT scan of Plaintiff's abdomen revealed hepatomegaly (enlargement of the liver), hepatic steatosis (fatty liver), and "[f]at density . . . at the right lateral abdominal wall [that] may represent" a lipoma (fatty lump). (Tr. 223.) The CT scan also revealed "[d]egenerative changes of the spine with disc space narrowing most prominent at L5-S1," and "[e]vidence of bilateral L5 par defects [i.e., spondylosis] and [a] grade 1 anterolisthesis of L5 on S1." (Tr. 223-24.)

- On October 26, 2015, Plaintiff visited Ruth and complained of, among other things, left knee pain. Plaintiff reported that she "fell into a hole at the coast 2 weeks ago causing left knee pain," and her x-ray at the hospital was negative "except for arthritis." (Tr. 211.) Ruth performed several tests and diagnosed Plaintiff with a knee sprain. (Tr. 213.)

- On January 11, 2016, Plaintiff visited Ruth and requested a medication refill. Plaintiff informed Ruth that she was "feeling much better" on an antidepressant, and stated that "she feels perfect." (Tr. 208.) Plaintiff also denied any "swelling, muscle pain, [or] joint pain." (Tr. 208.)

- On January 24, 2016, Plaintiff visited Ruth "with a chief complaint of constant insomnia," which Plaintiff and Ruth attributed to snoring and potential sleep apnea. (Tr. 204; *see also* Tr. 205-06, listing snoring as an active issue and diagnosing

"[i]nsomnia, unspecified"; Tr. 211, documenting reports of potential "sleep apnea" and that Plaintiff "has had snoring [with] interrupted sleep for years" and "wants [a] sleep study"). Plaintiff "denie[d]" experiencing any "swelling, muscle pain, [or] joint pain." (Tr. 204.)

- On February 8, 2016, Plaintiff complained to Ruth about "chronic" pain on the "posterior aspect" of her neck, and reported that she had "not had x-rays in many years." (Tr. 200.) Ruth's physical examination revealed that "neck stiffness" was present, there were signs of "diffuse and mild" tenderness on the left side of the neck and tenderness on the right side, and there were no signs of weakness or atrophy. (Tr. 202.) Ruth also noted that there was "no loss of C-spine lordosis" and "no pain on cervical compression." (Tr. 202.) Based on her physical examination and x-rays that revealed degenerative disc disease, Ruth diagnosed Plaintiff with "cervical disc degeneration" in the "cervicothoracic region." (Tr. 202-03, 222.)

- On March 14, 2016, Plaintiff visited Ruth and complained about "many years" of neck pain accompanied by shooting pain and "increasing numbness and weakness" in her right hand, which prevents her from opening "jars." (Tr. 195.) Ruth's examination revealed "diffuse and mild" tenderness, mild spasm, no weakness, no atrophy, and reduced strength (4/5) in Plaintiff's flexion and extension strength in her right hand. (Tr. 197.) Ruth diagnosed Plaintiff with radiculopathy and "cervical disc degeneration," referred her to a "chronic pain doctor," and ordered a cervical spine MRI. (Tr. 198.)

- On April 2, 2016, an MRI of Plaintiff's cervical spine revealed: (1) "[m]ultilevel degenerative disc disease, spondylosis and facet arthropathy"; (2) "[a]t C3-4, mild

central canal stenosis and moderate left neural foraminal stenosis which could affect the exiting left C4 nerve root"; (3) "[a]t C4-5, moderate central canal stenosis with cord flattening, and moderate bilateral neural foraminal stenosis"; and (4) "[a]t C5-6, mild right neural foraminal stenosis"; (5) at C7-T1, "[n]o significant central canal or neural foraminal stenosis," and "[m]ild posterior central disc protrusion"; (6) "moderate disc height loss throughout the cervical spine"; and (7) "[n]o central canal or neural foraminal stenosis" at the C2-3 level. (Tr. 226.) In addition, the medical doctor who reviewed the MRI noted that the "exam [was] technically adequate." (Tr. 226.)

### b.      The ALJ's Findings

As discussed above, the ALJ discounted Plaintiff's allegations of disabling physical impairments based on inconsistency with the objective medical evidence showing largely unremarkable physical examinations. In support of her conclusion, the ALJ noted that prior to Plaintiff's date insured of December 31, 2014, an October 2013 x-ray "revealed degenerative disc disease and cervical spondylosis," but Dr. Donaldson's January 2014 consultative physical examination also revealed that: (1) Plaintiff "exhibited normal range of motion in her shoulders, elbows, hands, wrists, thoracic and lumbosacral spine, hips, knees, ankles, and feet," (2) Plaintiff "shook with a strong dominant right hand, and her grip strength measured with a Jamar dynamometer 65 pounds on the right and 45 pounds on the left," (3) Plaintiff "had a normal hip exam, and her gait and station were normal," (4) Plaintiff "could tandem walk, heel walk, and toe walk," (5) Plaintiff "could dress and undress, go from sitting to standing, standing to sitting, sitting to supine, and supine to sitting, all without need for assistance or apparent discomfort," (6) Dr. Donaldson "did not note any joint or muscle abnormalities," although Plaintiff was "moderately deconditioned," (7) Plaintiff showed "symmetric 4+/5 strength in all extremities,"

(8) straight leg raise tests were negative, and (9) Plaintiff's "sensory function was intact." (Tr. 19-20.)

After discussing the "sparse" medical records predating the date last insured, the ALJ also noted, *inter alia*, that: (1) when Plaintiff complained of left knee pain in October 2015, Ruth diagnosed only an "unspecified sprain"; (2) Plaintiff exhibited a normal gait and posture in January 2016, and informed Ruth that she "felt perfect"; and (3) when Plaintiff complained of increasing numbness and weakness in her right hand in March 2016, Ruth's physical exam revealed only "some limited neck range of motion and reduced finger strength with flexion and extension strength at 4/5," normal gait and posture, no loss of cervical spine lordosis, intact upper extremity sensation, and "upper extremity deep tendon reflexes 2+ equal bilaterally." (Tr. 20.)

### c.    Plaintiff's Argument

Plaintiff argues that the ALJ erred in discounting her testimony based on objective medical evidence showing largely unremarkable physical examinations. In support of her argument, Plaintiff notes that the lateral view on the 2013 x-ray was "blurred," and the 2016 MRI, which was "technically adequate," showed "nerve root entanglement at C3-4" and "flattening of the cervical cord at C4-5." (Pl.'s Br. at 9.) Plaintiff argues that "[t]he greater resolution of the MRI revealed significant findings that were not visible in the 'blurred' x-ray[.]" (Pl.'s Br. at 9.) Plaintiff also argues that the ALJ erred in "finding that Plaintiff did not complain of neck pain" before her date last insured of December 31, 2014, and notes that medical records "consistently demonstrate limited range of motion and reduced upper extremity strength." (Pl.'s Br. at 9-10.)

///

///

### d.    Analysis

As an initial matter, the Court agrees that the ALJ erred when she stated that Plaintiff "did not specifically complain of neck pain until February 2016." (Tr. 20.) This error was harmless, however, because the ALJ also stated that Plaintiff "reported neck pain to her treating medical provider prior to and after her" date last insured, concluded that "degenerative disc disease of the cervical spine" and "spondylosis and facet arthropathy" were severe impairments, and accounted for Plaintiff's neck/cervical spine-related impairments by formulating an RFC that addressed, *inter alia*, Plaintiff's limitations on postural and manipulative activities. (*See* Tr. 15, 19-20.)

With respect to the 2013 x-ray, Dr. Ro, the radiologist, never opined that the 2013 x-ray was technically inadequate. Although Plaintiff argues that the MRI revealed significant findings that were not visible on the x-ray, Plaintiff fails adequately to address the fact that the ALJ appears to have accounted for the MRI results. Indeed, the ALJ concluded that the "medical evidence shows" that Plaintiff "has degenerative disc disease and spondylosis and facet arthropathy," and as a result, the ALJ found that "degenerative disc disease of the cervical spine" and "spondylosis and facet arthropathy" were severe impairments, and formulated an RFC that addressed Plaintiff's limitations on postural and manipulative activities. (*See* Tr. 15, 19-20; *see also* Tr. 50-51, indicating that Plaintiff's attorney and the ALJ discussed the MRI during the hearing, and it was noted the MRI showed "nerve root contact"; *cf.* Tr. 226, indicating that the MRI showed "[m]ultilevel degenerative disc disease, spondylosis[,] and facet arthropathy" that contributed to "*moderate* left neural foraminal stenosis which *could* affect the existing left C4 nerve root," and the MRI showed "*moderate* central stenosis with cord flattening" at C4-5) (emphasis added).

Finally, Plaintiff argues that the objective medical evidence supports her testimony because she consistently demonstrated limited range of motion and reduced upper extremity strength, but the ALJ cited a number of unremarkable physical examination results. Although Plaintiff provides an alternative, rational interpretation of the objective medical evidence, the ALJ's conclusion was reasonable and must be upheld. *See Childers v. Colvin*, No. 6:13-cv-01922-SI, 2015 WL 464333, at *8 (D. Or. Feb. 4, 2015) ("While Ms. Childers provides an alternative, rational interpretation of the objective medical findings, the Commissioner's reasonable conclusion must be upheld." (citing *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005))).

### 3. Daily Activities

The ALJ also discounted Plaintiff's testimony based on her daily activities. (*See* Tr. 21, "Given the complaints of disabling symptoms and limitations, the claimant has described daily activities that are not limited to the extent one would expect"). In support of her conclusion, the ALJ cited Dr. Donaldson's examination notes that discussed Plaintiff's reported activities. (*See* Tr. 21, citing Ex. 4F at 4.) In that portion of his notes, Dr. Donaldson stated that Plaintiff is able to do "all her own feeding, bathing, hygiene, and dressing," and that Plaintiff "cooks and does dishes, groceries, laundry, housework, and manages her own finances." (Tr. 187.) In addition, the ALJ noted that although Plaintiff reported in her function report that "she did not do crafts that required fine motor movements," she told Dr. Donaldson that "she painted, and made wind chimes and jewelry." (Tr. 21; *see also* Tr. 146, indicating that Plaintiff reported that she cannot do "fine motor crafts anymore like sewing, crotchet, [and] beading"; *cf.* Tr. 187, informing Dr. Donaldson that Plaintiff "likes to do crafts specifically painting and making wind chimes and jewelry").

"Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination." *Ghanim*, 763 F.3d at 1165 (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004), and *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007)). "Daily activities may also be 'grounds for an adverse credibility finding if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.'" *Id.* (citation omitted).

Nothing in the record or the ALJ's decision suggests that Plaintiff spends a substantial part of her day engaged in the performance of physical functions that are transferable to a work setting. Furthermore, the activities cited in the ALJ's decision do not truly contradict Plaintiff's testimony. Although Dr. Donaldson's examination notes reference the above-cited activities, his notes also indicate that Plaintiff reported that her "husband is very helpful around the house," and that she can only stand for ten to fifteen minutes at a time and sit for twenty minutes at a time due primarily to arthritic pain in her lower back, knees, and neck. (Tr. 184, 187.) Plaintiff made similar reports to the ALJ and Social Security Administration regarding her husband's assistance with daily activities, her need to take rest breaks, and her inability to sit or stand for extended durations. (*See* Tr. 44, "Q[:] And throughout the day, do you have to rest or take naps? A[:] I rest a lot. I'll . . . go to do a chore, like just washing dishes. I'll . . . stand at the sink for 15 minutes, maybe, at the most, washing dishes or cleaning up the kitchen. My hands go numb, my knees start hurting, I have to go sit down for a little while and then continue. . . . [M]y chores are all different at different times, depending on how long I have to rest before I can get back up again"; Tr. 142-48, reporting that Plaintiff has a hard time sitting or standing "for any length of time," Plaintiff "tr[ies] to do [her] daily chores such as cleaning cooking etc., taking several

breaks throughout the day," and Plaintiff's husband helps prepare meals and "often encourages and helps [his wife] to do daily chores"). In the Court's view, Plaintiff's reported ability to complete daily chores, often with the help of her husband and rest breaks, does not contradict her symptom testimony.

Additionally, the fact that Plaintiff "likes" to do crafts is not necessarily inconsistent with Plaintiff's report that she "cannot do fine motor crafts anymore like sewing, crotchet, [and] beading." (*Compare* Tr. 146, listing "crafts" under hobbies and interests, but describing an inability to "do fine motor crafts" in response to a specific question about whether there had been "changes in these activities" due to Plaintiff's conditions, *with* Tr. 187, indicating Plaintiff "likes" crafts but failing to ask about how frequently, if ever, Plaintiff still engages in such activities).

For these reasons, the Court concludes that the ALJ erred in finding Plaintiff not credible based on her daily activities. *See, e.g.*, *Ghanim*, 763 F.3d at 1165 (holding that the ALJ erred because the cited "daily activities, which included completing basic chores, sometimes with the help of a friend, . . . d[id] not contradict [the claimant's] testimony," and because there was "no indication that the limited activities [the claimant] engaged in, often with the help of a friend, either comprised a 'substantial' portion of [his] day, or were 'transferrable' to a work environment").

### 4. Conclusion

Although the ALJ erred in stating that Plaintiff did not specifically complain about neck pain until February 2016 and in rejecting Plaintiff's symptom testimony based on her daily activities of record, the ALJ's errors were harmless because the ALJ provided at least two other clear and convincing reasons for discounting Plaintiff's testimony (i.e., conservative treatment and conflicting medical evidence). *See* *Anderson v. Colvin*, 223 F. Supp. 3d 1108, 1129 (D. Or.

2016) (Simon, J.) ("[T]he ALJ provided two clear and convincing reasons for finding Plaintiff's symptom testimony not supported by the record. Accordingly, the Court must uphold the ALJ's determination."); *see also Mones v. Comm'r Soc. Sec. Admin.*, No. 14-917-CL, 2015 WL 4645448, at *7 (D. Or. July 1, 2015) (holding that the ALJ erred in discounting the claimant's testimony based on her daily activities and conflicting objective medical evidence, but concluding that any error was harmless because the ALJ did "provide[] two clear and convincing reasons").

## II. NURSE PRACTITIONER MOORE'S OPINION

### A. Applicable Law

"In order to reject the testimony of a medically acceptable treating source, the ALJ must provide specific, legitimate reasons based on substantial evidence in the record." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citation omitted). "However, only licensed physicians and certain other qualified specialists are considered 'acceptable medical sources.'" *Id.* (citation, brackets, and footnote omitted). Nurse practitioners are considered "other sources," *Britton v. Colvin*, 787 F.3d 1011, 1013 (9th Cir. 2015), and are therefore not entitled to the same deference as "acceptable medical sources." *Molina*, 674 F.3d at 1111. "An ALJ may discount the opinion of an 'other source,' such as a nurse practitioner, if she provides 'reasons germane to each witness for doing so.'" *Popa v. Berryhill*, 872 F.3d 901, 906 (9th Cir. 2017) (citation omitted).

### B. Application of Law to Fact

The parties agree that the ALJ was required to provide germane reasons for discounting Moore's opinion, but they disagree about whether the ALJ provided such reasons. (*See* Pl.'s Br. at 16, "The reasons the ALJ provided to dismiss Nurse Moore were not germane"; Def.'s Br. at

6, "The ALJ provided germane reasons for giving little weight to Ms. Moore's opinion"). The Court concludes that the ALJ provided germane reasons for discounting Moore's opinion.

First, the ALJ discounted Moore's opinion because she appeared to rely to a large extent on Plaintiff's properly discounted self-reports. (*See* Tr. 21, stating that Moore "appears to have based her opinion on the claimant's subjective pain and fatigue, noting only palpable tenderness as the objective basis of her opinion," and that Moore "seemed to uncritically accept as true most, if not all, of what the claimant reported"; *cf.* Tr. 180, "Identify the clinical findings and objective signs [that support your opinion]: Musculoskeletal pain – palpable tenderness [in the] neck [and] upper back – headache – will get MRI"). This was a germane reason for discounting Moore's opinion. *See Lombard v. Colvin*, No. 13–cv–1530–MC, 2015 WL 1477993, at *3 (D. Or. Mar. 31, 2015) ("[T]he ALJ noted [the social worker's] opinion appeared to stem largely from Plaintiff's self-reporting. As the ALJ properly found Plaintiffs reports of pain less-than credible, this is an additional germane reason for rejecting [the social worker's] opinion.") (citation omitted).

Plaintiff argues that there is "no evidentiary basis for finding" that Moore relied to a large extent on Plaintiff's self-reports. Plaintiff also notes that the "nature of fatigue and pain . . . is highly subjective" and that there are "no objective measurements for pain and fatigue." (Pl.'s Br. at 17.) In the Court's view, the ALJ reasonably found that Moore relied largely on Plaintiff's self-reports. Moore opined that Plaintiff suffers from significant physical limitations. For example, Moore opined that Plaintiff can only sit or "[s]tand/walk" for two hours or less during an eight-hour workday.[5] In other words, Moore opined that "Plaintiff would be confined to lying

---

[5] The Court notes that Moore treated Plaintiff on four occasions over almost three years. (*See* Tr. 174-77, listing visits on February 16 and November 23, 2011, and October 25 and November 26, 2013).

down most of the day." (Def.'s Br. at 6.) As the ALJ noted, however, Moore's opinion was based merely on self-reports of pain and signs of palpable tenderness. (*See* Tr. 180, "Identify the clinical findings and objective signs [that support your opinion]: Musculoskeletal pain – palpable tenderness [in the] neck [and] upper back – headache –will get MRI"). It was reasonable for the ALJ to conclude that Moore must have relied to a large extent on Plaintiff's self-reports, given (1) the disparity between Moore's opinion and the clinical findings and objective signs she cited in support, and (2) the fact that Moore's "treatment records do not note any clinical findings or objective signs to indicate that the claimant was so limited." (Tr. 21; *cf.* Tr. 177, listing self-reports of pain as Moore's findings; Tr. 176, failing to indicate that Plaintiff's physical exam was abnormal; Tr. 174, listing back and neck pain as Moore's primary findings; Tr. 175, indicating that Moore's findings on the day she issued her opinion were neck, back, and knee pain, and "unable to do physical activities"). Accordingly, the ALJ did not err in discounting Moore's opinion on this ground.

The ALJ also discounted Moore's opinion on the ground that she "did not have the benefit of reviewing other medical reports contained in the current record, which show[] the claimant is not as restricted as she opined." (Tr. 21.) In support of this finding, the ALJ cited, among other things, Dr. Donaldson's consultative physical examination (Ex. 4F), which, as discussed above in Part I.B.2.b., generally reflected unremarkable findings on examination of Plaintiff. It was appropriate for the ALJ to discount Moore's opinion evidence on this ground. *Cf. LaFollette v. Comm'r Soc. Sec.*, No. 17-3007, 2018 WL 1684454, at \*7 (E.D. Wash. Feb. 7, 2018) (holding that the ALJ provided "multiple valid reasons" for discounting a consultative physician's opinion, including the fact that the physician "did not have the benefit of reviewing

the other medical reports or submissions contained in the record that were provided after" he issued his opinion).

Plaintiff argues that the ALJ erred because Moore's opinion is "consistent with that of [Dr. Donaldson], except she provided functional limitations to correspond with the assessed impairments." (Pl.'s Br. at 16.) The Court disagrees. As Plaintiff acknowledges, Dr. Donaldson did not express any opinion regarding Plaintiff's work limitations. Thus, the ALJ appropriately focused on Dr. Donaldson's generally unremarkable findings on examination of Plaintiff and compared those findings to Moore's opinion that Plaintiff is disabled. It was reasonable for ALJ to conclude that Dr. Donaldson's examination did not suggest that Plaintiff was as limited as Moore opined. (*Compare* Tr. 181-82, opining in 2013 that Plaintiff can stand/walk for two hours or less, sit for two hours or less, rarely lift and carry ten pounds or less, never lift or carry ten pounds or more, and rarely stoop or crouch, and that Plaintiff would miss more than four days of work per month, *with* Tr. 188, noting that Dr. Donaldson's 2014 exam revealed that Plaintiff's gait and station were normal, Plaintiff could tandem, heel, and toe walk, Plaintiff "can dress and undress, go from sitting to standing, standing to sitting, sitting to supine, and supine to sitting, all without need for assistance or apparent discomfort," Plaintiff's "[r]ange of motion is normal for the shoulders, elbows, hands, wrists, T-spine, LS spine, hips, knees, ankles, and feet," Plaintiff's "[s]trength is 4+/5 and symmetrical in all extremities," straight leg raise tests were negative, Plaintiff's hip exam was normal, and Plaintiff exhibited grip strength of "65 pounds right and 45 pounds left").

In sum, the ALJ provided germane reasons, supported by substantial evidence, for discounting Moore's opinion.

## CONCLUSION

For the foregoing reasons, the Court AFFIRMS the Commissioner's decision because it

is free of harmful legal error and supported by substantial evidence.

**IT IS SO ORDERED.**

DATED this 22nd day of October, 2018.

_____
STACIE F. BECKERMAN
United States Magistrate Judge